## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kathryn Rose, John Harris, and Jenifer Harris,<br><br>                    Plaintiffs,<br><br>v.<br><br>Lincoln Benefit Life Company,<br><br>                    Defendant. | Case No. 20-cv-02260 (SRN/TNL)<br><br><br><br>**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Jacob Patsch Harris and Richard D. Snyder, Fredrikson & Byron, PA, 200 South Sixth Street, Ste. 4000, Minneapolis, MN 55402, for Plaintiffs

Hannah Carter, Faegre Drinker Biddle & Reath LLP, 1144 15th Street, Ste. 3400, Denver, CO 80202; Kate Middleton, Faegre Drinker Biddle & Reath LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN, 55402; Katherine Villanueva, Faegre Drinker Biddle & Reath LLP, One Logan Square, Ste. 2000, Philadelphia, PA 19103, for Defendant

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Lincoln Benefit Life Company's Motion for Summary Judgment [Doc. No. 32]. For the reasons set forth below, Defendant's Motion is granted in part and denied in part.

## I.    BACKGROUND

### A. Plaintiffs' Life Insurance Policy

Defendant Lincoln Benefit Life Insurance Company ("Lincoln") issued a "Last Survivor Flexible Premium Adjustable Life Insurance Policy" ("the Policy") to Plaintiffs John and Jenifer Harris on December 1, 2011. (Villanueva Decl. [Doc. No. 37], Ex. 2

1

(Policy) at 2.) Providing joint life insurance coverage, the Policy obligates Lincoln to pay a death benefit of $4 million after the death of the last surviving insured. (Policy at 1.) The Harrises selected the Policy at the recommendation of their insurance agent, Jon Christie, because of its desirable premium pricing framework and its option to recoup their premium payments after a certain number of years. (Christie Decl. [Doc. No. 41] ¶ 9.)

The Harrises designated their daughter, Plaintiff Kathryn Rose, as the Owner and premium payor of the Policy. (Villanueva Decl., Ex. 2 (Policy Application) at 44.) The Policy provides for flexible payment of premiums, meaning Ms. Rose, as Owner, could change the amount and timing of payments. (Policy at 1, 10.) Failure to make sufficient payments to cover the monthly deductions would cause the Policy to enter a grace period of 61 days, beginning on the premium due date. (*Id.* at 10.) The Policy would lapse if Plaintiffs did not make a sufficient payment by the end of the grace period. (*Id.*)

The Policy requires Lincoln to send two payment-related notices: a premium payment reminder notice if Plaintiffs pay annually, semi-annually, or quarterly; and a notice "at the most recent address [Lincoln] ha[s] for [Plaintiffs] at least 30 days prior to the day coverage lapses." (*Id.*) In addition, Lincoln must send annual statements on the Policy anniversary date. (Policy at 16; Snyder Decl. [Doc. No. 42], Ex. 2 (Heinrich Dep. Tr.) at 77:3–6.) Annual statements contain information about a policy's value and the date on which it will lapse without additional premium payments. (Policy at 16; Villanueva Decl., Ex. 3 (Annual Statements for 2016–17 and 2017–18).)

In the event of lapse, the Policy provides that it "may be reinstated" upon compliance with four conditions. (Policy at 11.) Most relevant here, the second condition

requires Plaintiffs to "[g]ive [Lincoln] the proof [it] require[s] that any living insured is still insurable in the same payment class that the policy was issued[.]" (*Id.*) Plaintiffs were originally insured under the payment class of "Preferred Non-Smoker." (Policy at 1.)

### B. Lincoln's Corporate Structure and Mailing Procedures

In 2013, Lincoln ceased selling new insurance policies after being acquired by a private equity group, Resolution Life Holdings. (Heinrich Dep. Tr. at 42:15–45:23.) Since that time, Lincoln has employed a third-party vendor, DXC Technologies ("DXC"), to perform administrative and underwriting functions on Lincoln's behalf. (*Id.* at 19:4–24:23.) DXC's responsibilities include making policy calculations, maintaining Lincoln's software and electronic databases, including policy files, as well as printing and mailing correspondence and documents to policyholders. (*Id.* at 19:4–24:23, 93:12–20.)

DXC uses an automated software, DocuMaker, to generate correspondence based on policy data. (First Heinrich Decl. ¶ 7.)[1] When DocuMaker generates correspondence, such as a payment reminder notice, an image replication is stored in Eclipse, the image repository within DXC's Automated Work Distributor ("AWD") system. (*Id.* ¶ 9.) The AWD system records each time correspondence is generated for a particular policy in that policy's "AWD History." (Heinrich Dep. Tr. at 106:15–18; Snyder Decl., Ex. 11 (AWD History).)

Once generated, correspondence is electronically transmitted in a batch of documents to DXC's Print/Mail/Archive ("PMA") process system. (First Heinrich Decl. ¶

---

[1] The First Heinrich Declaration is Exhibit 4 to the Villanueva Declaration [Doc. No. 36].

12.) The PMA system prints a Batch Coversheet for each print job, containing information about what is printed, inserted, and mailed for each batch. (*Id*. ¶ 13.) Then, the correspondence is printed and inserted into an envelope by an inserter machine, which records this information in an Insertor Log. (*Id*. ¶ 16.) Print and Insert Operators conduct routine spot checks to ensure accurate processing. (*Id*. ¶ 18.)

After correspondence has been printed and inserted, Pitney Bowes Presort picks up the batch from DXC. (*Id*. ¶ 19–25.) Pitney Bowes Presort then sorts the correspondence at its own facility, under the supervision of a USPS Officer, before handing it off to USPS for delivery. (*Id*. ¶ 25, 28.) If any problems arise during the mailing process, DXC creates a Production Disruption Event document and notifies Lincoln. (*Id*. ¶ 29.)

### C. Lincoln's Notices, Plaintiffs' Payments, and Lapse of the Policy

Plaintiffs' initial premium payment in 2011 sufficed to cover their annual premiums in 2012 and 2013. (Christie Decl. ¶ 10.) The first time an annual premium became due, in December 2014, Lincoln did not timely mail Ms. Rose a payment reminder notice and the Policy entered its grace period. (Snyder Decl., Ex. 4.) Rather, Lincoln mailed the notice one day after the end of the grace period, on February 2, 2015. (*Id.*; Christie Decl. ¶ 11.) Plaintiffs paid the premium and their coverage continued. (Snyder Decl., Ex. 3 (Rose Dep. Tr.) at 40:19–24.) Lincoln also failed to timely mail Plaintiffs their 2015–2016 Annual Statement in December 2015, belatedly mailing it 18 months later in June 2018. (Snyder Decl., Ex. 6.; Heinrich Dep. Tr. at 78:9–79:11.) It appears that correspondence between the parties was delivered smoothly in 2016 and 2017. (Rose Dep. Tr. at 24:3–21, 27:7–20.)

However, Plaintiffs allege Lincoln failed to send Plaintiff Rose a payment reminder notice ("Reminder Notice") in December 2018. (Amended Compl. [Doc. No. 22] ¶ 20.) Lincoln asserts that it mailed Ms. Rose the Reminder Notice on October 31, 2018, requesting a premium payment by December 1, 2018. (Def.'s Mem. at 5; First Heinrich Decl. ¶ 4.) Lincoln submitted to the Court a copy of the Reminder Notice, (First Heinrich Decl., Ex. A), which Plaintiff Rose denied receiving. (Rose Dep. Tr. at 29:11–30:8.) Because she did not receive a reminder, Ms. Rose did not pay the requested premium by December 1, 2018. (*Id.* at 27:24–28:23; First Heinrich Decl. at ¶ 5.)

Plaintiffs allege Lincoln failed to send Ms. Rose a notice that the Policy had entered the 61-day grace period ("Grace Period Notice"). (Amended Compl. ¶ 21.) Lincoln asserts that DXC generated the Grace Period Notice on December 3, 2018, printed it on December 4, 2018, and transmitted it to USPS thereafter. (First Heinrich Decl. ¶ 4–30.) Lincoln submitted to the Court a copy of the Grace Period Notice, which states that the Policy had entered the grace period for non-payment of premium and would terminate on February 2, 2019 without payment of the requested sum. (First Heinrich Decl., Ex. B (Grace Period Notice).) Ms. Rose denies receiving the Grace Period Notice. (Rose Dep. Tr. at 31:2–19.) Although the Grace Period Notice states "COPY TO: JON C CHRISTIE" below the signature line, Mr. Christie also denies receiving it. (Grace Period Notice; Christie Decl. ¶ 14.) Lincoln did not receive a payment by February 2, 2019 and the Policy lapsed. (First Heinrich Decl. ¶ 32–33.)

Lincoln asserts it sent Plaintiffs a notice ("Lapse Notice") on February 4, 2019, which Plaintiffs deny receiving. (Def.'s Mem. at 8; First Heinrich Decl. ¶ 33; Rose Dep.

Tr. at 32:2–21.) Lincoln submitted an unsigned copy of the Lapse Notice. (First Heinrich Decl., Ex. F (Lapse Notice).) Like the Grace Period Notice, the Lapse Notice lists Mr. Christie as a copy recipient and Mr. Christie denies receiving it. (*Id.*; Christie Decl. ¶ 15.)

Plaintiffs did not learn that Lincoln had terminated the Policy until late 2019, after Mr. Christie contacted Lincoln in preparation for an upcoming meeting with Mr. Harris. (Christie Decl. ¶ 13.) Lincoln informed Mr. Christie that it had terminated the policy several months earlier. (*Id.*) Taken aback by this news, Mr. Christie immediately told Mr. Harris. (Christie Decl. ¶ 13.)

### D. Plaintiffs' Attempts to Reinstate the Policy

Lincoln provided Plaintiffs with an Application for Reinstatement ("Application"), which the Harrises completed and faxed to Lincoln on January 28, 2020.[2] (Villanueva Decl., Ex. 11 (Application for Reinstatement).) On the Application, Plaintiffs answered "no" to a series of questions inquiring about whether they suffered from various medical conditions. (*Id.* at 4.)

Pursuant to Plaintiffs' authorization in the Application, Lincoln requested Mr. Harris's medical records. (*Id.*; Fraley Decl. ¶ 12.) Lincoln's Medical Director, Dr. Robert Frank, reviewed the records and expressed concerns to Lincoln about Mr. Harris's insurability and future mortality risk. (Fraley Decl. ¶ 14.) Based on its internal underwriting guidelines and Dr. Frank's opinion, Lincoln determined that Mr. Harris was no longer

---

[2] Lincoln asserts it received the application in February 2020, but the discrepancy is not material to the case. (Villanueva Decl., Ex. 1 (Fraley Decl.) ¶ 5.)

insurable in the same payment class as when the Policy was issued and declined to reinstate the Policy. (*Id.* ¶ 13–16.) Lincoln informed Ms. Rose of its decision via letter on March 11, 2020. (Snyder Decl., Ex. 10.)

Plaintiffs asked Lincoln to review their file again and reconsider its decision. (Villanueva Decl., Ex. 10 (Apr. 30, 2020 Letter).) Lincoln requested additional medical records from Mr. Harris, including the results of a prior colonoscopy and of a "CT Angiogram performed at [Mr. Harris's] expense." (*Id.*; Fraley Decl. ¶ 18.) According to email correspondence from Lincoln to Mr. Harris in June 2020**,** Mr. Harris did not provide the records Lincoln sought. (Villanueva Decl., Ex. 10 (June 1, 2020 Letter).) In its last email to Mr. Harris before this lawsuit commenced, Lincoln reiterated that the Policy remained in a lapsed status, but that it would "give Mr. and Mrs. Harris's medical condition additional consideration if additional testing and results are provided." (*Id.* (June 12, 2020 Letter).)

### E.  This Lawsuit

Plaintiffs commenced this action in October 2020, alleging breach of contract and unjust enrichment. (Amended Compl. ¶ 48–103.) Plaintiffs' Amended Complaint alleges Lincoln breached the Policy by failing to send the 2018 Reminder and Grace Period Notices, and therefore Lincoln did not terminate the Policy effectively. (*Id.* ¶ 48–80.) Plaintiffs also allege that Lincoln has been unjustly enriched by retaining their premium payments. (*Id.* 81–86.)

Following a settlement conference, the parties agreed to attempt to resolve their dispute through the re-evaluation of Plaintiffs reinstatement. (Amended Compl. ¶ 37.) In

June 2021, Mr. Harris provided Lincoln with the results of an echocardiogram and colonoscopy. (Fraley Decl. ¶ 19.) Lincoln repeated its request for the results of a CT angiogram and noted that after receiving those results it would still need to review Ms. Harris's medical records prior to reinstatement. (Villanueva Decl., Ex. 10 (Aug. 5, 2021 Letter).) The Court thereafter granted Plaintiffs leave to amend their Complaint to add claims for breach of contract based on Lincoln's refusal to reinstate the Policy. (Order Granting Leave to Amend [Doc. No. 20]; Amended Compl. ¶ 87–103.)

Lincoln moves for summary judgment on all claims. (Def.'s Motion [Doc. No. 32].) It contends that it sent the required Notices and properly denied reinstatement based on Mr. Harris's medical records, and that it thus did not breach the Policy as a matter of law. Plaintiffs oppose Lincoln's motion, arguing that there is sufficient evidence to raise a genuine issue of disputed material fact as to whether Lincoln actually mailed, and Plaintiffs actually received, the Notices. Additionally, Plaintiffs argue that Lincoln erroneously interpreted the Policy's reinstatement requirements and thus cannot show that it properly denied reinstatement as a matter of law.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

8

(1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## III. DISCUSSION

Plaintiffs' breach of contract claims stem from two separate incidents: (1) Lincoln's alleged failure to send the required Notices; and (2) Lincoln's refusal to reinstate the Policy in compliance with the Policy's terms. The Court will briefly discuss Plaintiffs' unjust enrichment claim before addressing each category of breach in turn.

### A. Unjust Enrichment

Lincoln contends that Plaintiffs' claim of unjust enrichment fails as a matter of law because the parties' relationship is governed by contract. (Def.'s Mem. at 25, n. 11.) Plaintiffs have not addressed their claim of unjust enrichment in their briefs.

"To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996). Minnesota law is clear that "equitable relief cannot be granted where the rights of the parties are governed by a valid contract." *U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) (denying unjust enrichment claim after finding the parties had a valid contract). This dispute directly concerns the Policy that governed the parties' relationship, and Plaintiffs fail to identify any other relationship with Lincoln outside of the Policy's scope. Accordingly, the Court grants summary judgment to Lincoln on Plaintiffs' claim of unjust enrichment.

### B.  Breach of Contract for Failure to Send Notices

To succeed on a breach of contract claim, Plaintiffs must show "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). The parties agree that the Policy requires Lincoln to send Plaintiffs a Reminder Notice each time a premium payment becomes due and a Grace Period Notice if Lincoln does not receive a payment by the due date. The only element in dispute is whether Lincoln breached the Policy by not sending the Notices: Plaintiffs allege that Lincoln did not send them, Lincoln asserts that it did.

To address the predicament that arises when one litigant asserts that they properly mailed a letter and the other asserts that it never arrived, courts have developed a presumption commonly known as the "mailbox rule." The mailbox rule presumes, "in the

10

absence of proof to the contrary, that mail properly addressed and sent with postage prepaid is duly received by the addressee." *Nafstad v. Merchant*, 228 N.W.2d 548, 550 (Minn. 1975). Once the addressee denies receipt of the mail, however, the burden of proof shifts to the sender to "prove timely mailing by a fair preponderance of the evidence. To do so, [the sender] [i]s required to show evidence of habit or custom with respect to mailing from the sender's office, coupled with some evidence showing compliance with the custom in the particular instance." *Id.*

Plaintiffs deny receipt, so Lincoln bears the burden of showing evidence of its customary mailing practices and that it followed those practices here. To meet that burden, Lincoln initially offered the testimony of Connie Heinrich, its Operations Director, as well as documents tracking its mailing process. (Heinrich Dep. Tr.; First Heinrich Decl.; First Heinrich Decl., Exs. C, D, G.) Lincoln submitted a second declaration by Ms. Heinrich ("Supplemental Declaration") with its Supplemental Brief. (Second Villanueva Decl. [Doc. No. 60], Ex. 1 (Heinrich Supp. Decl.).)[3] The First Declaration focuses on Lincoln's mailing

---

[3] Plaintiffs' challenges to the timing and admissibility of this second declaration fail. As to timing, "[t]he district court has broad discretion in permitting supplementation of the summary judgment record." *DC & G, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 826 (8th Cir. 2009). Given the importance of Ms. Heinrich's testimony to this dispute, the Court will consider the Supplemental Declaration as part of Lincoln's evidence on summary judgment.

As to admissibility, Plaintiffs argue that Ms. Heinrich lacks the personal knowledge to testify about Lincoln's mailing practices and that her testimony is based on inadmissible hearsay. (Pl.'s Mem. at 16–20.) A declaration to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the [declarant] is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Lay opinion testimony is admissible if the witness has personal knowledge or perceptions based on industry experience." *Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 758 (8th Cir. 2015).

process in general and as employed to generate and mail Plaintiffs' Notices, whereas the Supplemental Declaration provides additional details about Ms. Heinrich's role in relation to DXC. (First Heinrich Decl. ¶ 7–28; Heinrich Supp. Decl.)

Turning to the strength of Lincoln's evidence, Lincoln contends that Ms. Heinrich's Declarations and the DXC documents demonstrate that it followed its customary mailing practices in sending Plaintiffs' Notices. (Def.'s Mem. at 16–19; Def.'s Reply Mem. 8–10.) Lincoln argues that this evidence is sufficient to raise the *Nafstad* presumption of receipt of the Notices, and therefore it did not breach the Policy as a matter of law. (*Id.*) In

---

Ms. Heinrich testified that she has worked as Lincoln's Operations Director for four years. (Heinrich Dep. 11:9–10.) In that capacity, she oversees the mailing processes implemented by DXC, including "recommending, reviewing, and approving updates to operational processes and addressing issues pertaining to the operational processes." (Heinrich Supp. Decl. ¶ 9.) Lincoln directs DXC's processes and DXC must follow Ms. Heinrich's guidance as to their implementation. (*Id.* ¶ 15.) Through weekly meetings with and reports from DXC, Ms. Heinrich resolves any issues about policy-related correspondence. (*Id.* ¶ 10–14.) Ms. Heinrich's deposition testimony and Supplemental Declaration establish that she has sufficient personal knowledge of DXC's mailing practices to support her First Declaration.

Nor is Ms. Heinrich's testimony inadmissible because she bases it on documents produced by DXC. Under Federal Rule of Evidence 803(6) "a record created by a third party and integrated into another entity's records is admissible as the record of the custodian entity, so long as the custodian entity relied upon the accuracy of the record and the other requirements of Rule 803(6) are satisfied." *Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010). The Heinrich Declarations establish that Lincoln relies on DXC's mailing processes to determine when policies lapse and to communicate with their customers. (First Heinrich Decl. ¶ 29–33.) In short, a significant function of Lincoln's business, policyholder communications, depends upon the reliability of DXC's processes and the accuracy of the documents generated to track those processes. Under *Brawner*, Ms. Heinrich is a proper custodian for the introduction of DXC's documents.

response, Plaintiffs argue that Lincoln's evidence does not demonstrate it followed its customary practices in this instance. (Pls.' Opp'n at 14, 20–24.)

The DXC documents purport to track the step-by-step generation and mailing of the Grace Period and Lapse Notices. (First Heinrich Decl., Exs. C, D, G.) To start, the documents include screenshots of the Notices as generated by DocuMaker, with each Notice's batch number identified. (First Heinrich Decl., Ex. C.) Next, the PMA Coversheets record the number and types of items included in each Notice's batch. (*Id.*, Exs. D, G.) The PMA Coversheet batch information corresponds to the information about the batch reflected in the Inserter Logs. (*Id.*, Ex. D at 27, 28.) Finally, the documents include two Pick-Up Slips from Pitney Bowes Presort, which reflect the same number of items for each batch as recorded on the Coversheets and Inserter Logs. (*Id.*, Ex. D at 29, Ex. G at 19.) These documents, and Ms. Heinrich's testimony that she did not receive any notice of a disruption or problem with the batches from DXC, present some evidence to establish that Lincoln employed its customary mailing practices here.

However, there are conspicuous gaps in Lincoln's record. Most notably, the AWD History for Plaintiffs' Policy does not contain an entry for the generation of the Reminder Notice or the Grace Period Notice. (AWD History at Harris/LBL 000388–89.) The AWD History for Plaintiffs' policy contains regular entries from September 29, 2015 through October 27, 2017. (*Id.*) The following entry is from January 21, 2020 and makes a note about Plaintiffs' reinstatement application. (*Id.* at Harris/LBL 000388–389.) Although Ms. Heinrich testified that all system-generated mail or correspondence for a policy should be reflected in the policy's AWD History, she could not explain why there are no entries in

Plaintiffs' AWD History for more than two years. (Heinrich Dep. Tr. at 106:15–18, 109:19–110:6.) Lincoln's failure to explain this gap, which covers the exact period Lincoln should have sent the Notices to Plaintiffs, significantly undermines its assertion that it followed its customary practice in this instance.

Moreover, the DXC documents only track correspondence at the batch level. The PMA Coversheets, Inserter Logs, and Pick-Up Slips do not reflect the details of any individual piece of mail contained within the batch. Additionally, the DXC documents lack evidence showing that Pitney Bowes Presort properly delivered the relevant batches to the USPS. Ms. Heinrich's First Declaration states that the Grace Period Notice "was handed off to the USPS for delivery along with the other mail processed by the presort facility for that geographic destination," and that the USPS "did not return the [Grace Period Notice] as undeliverable." (First Heinrich Decl. ¶ 28, 31.) This generalized information does not concretely establish that Plaintiffs' Notices were "properly addressed and sent." *Nafstad*, 228 N.W.2d at 550.

Additionally, Plaintiffs' insurance agent Jon Christie testified that he did not receive the Grace Period Notice or Lapse Notice, despite the Notices reflecting "COPY TO: JON C CHRISTIE" below the signature line. (Grace Period Notice; Lapse Notice; Christie Decl. ¶ 14–15.) Lincoln has not addressed whether it customarily sends copies of important correspondence to policyholders' agents, but the discrepancy between the documents and Mr. Christie's testimony raises the possibility of an irregularity in mailing Plaintiffs' Notices.

Furthermore, the Court observes that Lincoln's evidence only minimally addresses the Reminder Notice of October 31, 2018. Ms. Heinrich's First Declaration merely states: "[o]n October 31, 2018, Lincoln Benefit generated, printed, and mailed a premium due notice . . . to Plaintiff Kathryn Rose in its regular course of business." (First Heinrich Decl. ¶ 4.) Though Lincoln provided documentary evidence to demonstrate the proper mailing of the Grace Period and Lapse Notices, it provided no equivalent paper trail for the Reminder Notice. Absent such documentary support, Ms. Heinrich's First Declaration creates the precise evidentiary problem the *Nafstad* presumption is designed to avoid: a swearing contest between two parties with irreconcilable testimony. Ms. Heinrich's lone statement is insufficient to rebut Plaintiffs' denial of receipt as to the Reminder Notice.

Finally, the evidence shows that Lincoln has a history of failing to timely send these Plaintiffs the correspondence required by their Policy. (Christie Decl. ¶ 11; Heinrich Dep. 78:9–89:11.) Viewing the facts in the light most favorable to the non-moving party, Lincoln has not established that it followed its customary mailing practice for both the Reminder and Grace Period Notices. Lincoln is thus not entitled to the *Nafstad* presumption of receipt, and therefore has not presented sufficient evidence for the Court to find that it mailed the Notices as a matter of law.[4] Accordingly, the Court denies summary judgment to Lincoln on Plaintiffs' breach of contract claims relating to Lincoln's failure to send the Notices.

---

[4] The Court notes Plaintiffs' additional argument that Minnesota law requires Lincoln to prove actual receipt of the Notices to effectively terminate their life insurance Policy. (Pls.' Opp'n at 25–28.) Because Lincoln has not proven that it mailed the Notices as a matter of law, the Court need not reach this issue.

### C.  Breach of Contract for Failure to Reinstate

Plaintiffs allege that Lincoln breached the Policy by failing to reinstate it upon receiving their Application. (Amended Compl. ¶ 87–103.)  The relevant provision in the Policy states:

> If this policy terminates prior to the death of the last surviving insured and if this policy has not been surrendered, this policy may be reinstated provided you:
>    1. Make your request within five years of the date the policy entered the grace period;
>    2. Give the proof we require that any living insured is still insurable in the same payment class that the policy was issued;
>    3. Make a payment sufficient to cover the unpaid monthly deductions for the grace period, and keep the policy in force for three months from the date of reinstatement; and
>    4. Pay or ask us to reinstate any policy debt as described in the Loan Interest provision.

(Policy at 11.)

The parties agree that compliance with all four enumerated conditions is required for reinstatement. Their dispute arises from the interpretation of two phrases in the provision: the meaning of "*may* be reinstated" in the prefatory clause and the meaning of "*any* living insured" in the second requirement. Neither party argues that these phrases create ambiguity.

The Court follows Minnesota law in the interpretation of insurance policies. *Nat'l Union Fire Ins. Co. of Pittsburg v. Terra Indus., Inc.*, 346 F.3d 1160, 1164 (8th Cir. 2003). General contract principles govern. *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 879 (Minn. 2002). "If the language of an insurance contract is unambiguous, it must be given its plain and ordinary meaning. But if the language is ambiguous, it will be construed

against the insurer, as drafter of the contract." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006) (citations omitted). Language is ambiguous if it is reasonably subject to multiple interpretations, as determined "from the viewpoint of a layperson, not a lawyer." *Mut. Serv. Cas. Ins. Co. v. Wilson Twp.*, 603 N.W.2d 151, 153 (Minn. Ct. App. 1999). However, courts must "guard against the invitation to create ambiguities where none exist." *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d. 32, 36 (Minn. 1979) (citation omitted). "The language must be considered within its context, and with common sense." *Mut. Serv.*, 603 N.W.2d at 153.

### 1.  "May" and Discretion to Deny Reinstatement

Lincoln argues that the use of "may," rather than "must," in the prefatory clause demonstrates that the Policy grants Lincoln the absolute discretion to refuse reinstatement. (Def.'s Reply Mem. at 11–12.) Plaintiffs argue that, notwithstanding "may," Lincoln is required to reinstate the Policy if Plaintiffs meet all four enumerated requirements. (Pls.' Supp. at 14–17.)

Under Minnesota law, "performance of the conditions specified [for reinstatement] in the policy continues the original policy and is not the issuance of a new one." *Sellwood v. Equitable Life Ins. Co. of Iowa*, 42 N.W.2d 346, 350 (Minn. 1950). Thus, a policy may be reinstated "if the insured complies with the conditions specified in the policy." *Id.* (finding the plaintiff had a "right" to reinstatement where the policy stated it 'may' be reinstated upon performance of conditions); *see also Nagel v. Franklin Life Ins. Co.*, No. C5-01-610, 2001 WL 1223416, at *2 (Minn. Ct. App. Oct. 16, 2001) (finding no

17

reinstatement where plaintiffs complied with only one of four conditions stated in their insurance policy).

Beyond Minnesota, it is a generally accepted principle of hornbook law that compliance with the specified conditions confers a right to reinstatement:

> Where the policy specifies the terms on which the insured may obtain a reinstatement of a policy, the reinstatement of a lapsed policy pursuant to the conditions therein is not a matter of grace on the part of the insurer but a contractual right which, by definition, survives the lapse of the policy.
>
> In such case, the insured has an absolute right to be reinstated on the terms provided by the policy, and, his or her rights thereto are fixed by the terms or provisions of his or her policy, in the absence of regulation by statute.

11 Steven Plitt et al., *Couch on Insurance* § 33:8 (3d ed. June 2022 Update).

Lincoln fails to provide any authority to the contrary. Consequently, the Court finds that the phrase "may be reinstated" does not give Lincoln the absolute discretion to deny reinstatement if Plaintiffs complied with the four specified conditions.

However, although Lincoln cannot refuse reinstatement if Plaintiffs comply with the Policy's conditions, Lincoln does retain some discretion. In particular, the second condition requires Plaintiffs to provide "the proof [Lincoln] require[s] of insurability." (Policy at 11.)

*Couch on Insurance* is again instructive: "if satisfactory evidence of good health is required, and it cannot be furnished, the insurer need not reinstate." *Couch on Insurance* § 33:61. If the initial information provided by the policyholder in the application for reinstatement is not satisfactory, the insurer has the right to request additional evidence of insurability. *Id*. § 33:63. It appears that it is common for an insurer to ask for additional

18

proof of good health or insurability for reinstatement. *See, e.g.*, *Erickson v. Equitable Life Assur. Soc. of U.S.*, 258 N.W. 736, 272 (Minn. 1935) (describing insurer's refusal to reinstate the plaintiff's life insurance because the plaintiff failed to provide the requested additional medical evidence of insurability).

Still, the insurer has a duty to assess the evidence of insurability "in the light of common sense and reason, and not . . . arbitrarily or capriciously." *Couch on Insurance* § 33:65. The Minnesota Supreme Court succinctly illustrated the balance between the rights and duties of insurer and insured more than 100 years ago. *Hinchliffe v. Minn. Com. Men's Ass'n*, 171 N.W. 776 (Minn. 1919). In *Hinchliffe*, the plaintiff sought to recover a death benefit from a mutual insurance association after her husband passed away. *Id.* at 777. The association refused to pay the benefit, arguing that the deceased's insurance had lapsed prior to his death for nonpayment of dues. *Id.* The court ultimately granted a new trial because of an evidentiary error, yet made a point of discussing reinstatement:

> [W]e deem it proper to say that in our opinion the [beneficiary] certificate did not give [the insurer] the right to arbitrarily refuse reinstatement of [the insured], after suspension for nonpayment of the assessment. The [beneficiary] certificate gave [the insured] the right to reinstatement on payment of the delinquent assessment, subject to the approval of the board of directors. But [the] deceased had contract rights which the board of directors could not arbitrarily take or withhold from him. [The insurer] was obliged to act reasonably and with fairness to the insured.

*Id.* at 778.

The same long-standing principles apply here. In sum, the Court finds that while Plaintiffs have a contractual right to reinstatement upon satisfaction of the conditions listed

in the Policy, Lincoln ultimately retains the right to evaluate whether the conditions have been satisfied.

Multiple inconsistencies in the record raise a genuine issue of disputed material fact as to whether Lincoln assessed the evidence of Mr. Harris' insurability "in the light of common sense and reason, and not . . . arbitrarily or capriciously." *Couch on Insurance* § 33:65. For example, the Declaration of Lisa Fraley, Lincoln's Chief Underwriter, contradicts her deposition testimony on the precise reason why Lincoln found Mr. Harris uninsurable in the same payment class. (Snyder Decl., Ex. 5 (Fraley Dep.) at 74:9–76:25, 89:9–10; Fraley Decl. ¶ 13.) Additionally, Lincoln requested that Mr. Harris submit a CT angiogram paid for at his own expense, yet one of Lincoln's underwriting guidelines states that "[m]edical examinations and tests requested with the first reinstatement will be at company expense." (April 30, 2020 Letter; Fraley Decl. ¶ 18; Snyder Decl., Ex. 13 (RESOLUTION – Inforce Underwriting Guidelines) at 26.) Lincoln's Medical Director could not even recall which underwriting guidelines he used when he initially evaluated the Harris's application for reinstatement. (Snyder Decl., Ex. 12 (Dr. Frank Dep.) at 23:21, 25:2–16.) Viewing the facts in the light most favorable to the Plaintiffs, the Court finds that Lincoln has not demonstrated it exercised its discretion in accordance with the Policy as a matter of law. The Court therefore denies summary judgment to Lincoln on whether it properly denied reinstatement based on Mr. Harris's insurability.

### 2.  "Any" Living Insured

Lincoln asserts that the Policy's use of "any living insured" requires both Plaintiffs to submit satisfactory proof of their insurability, and that absent such proof, Lincoln

properly declined reinstatement. (Def.'s Supp. at 8.) Plaintiffs argue that the phrase "any living insured" in the second reinstatement condition means that only one Plaintiff, either Mr. or Ms. Harris, must prove that they are insurable in the same payment class for reinstatement to occur. (Pls.' Opp'n 28–32.)

Because neither party argues that "any" is ambiguous, "it must be given its plain and ordinary meaning." *Travelers Indem. Co.*, 718 N.W.2d at 894. The Policy does not define the word "any," so "the dictionary is the next best place to look" for guidance. *Essentia Health v. ACE Am. Ins. Co.*, 541 F. Supp. 3d 943, 949 (D. Minn. 2021); *see also Russell v. Sentinel Ins. Co.*, 906 N.W.2d 543 (Minn. Ct. App. 2018) ("[W]e may rely on dictionary definitions in determining the ordinary meaning of insurance-policy terms.").

Plaintiffs offer two definitions: Black's Law Dictionary, defining "any" as "some, one out of many;" and Random House Webster's Unabridged Dictionary, defining "any" as "one, a, an or some." (Pls.' Supp. at 10 (quoting *Black's Law Dictionary* 86 (5th ed. 1979) and *Random House Webster's Unabridged Dictionary* 96 (2d ed. 2001)).) Lincoln does not direct the Court to a dictionary. Rather, Lincoln urges the Court to adopt an interpretation of "any insured" based on the analysis of courts in other districts. (Def.'s Supp. at 8–11.) However, these cases do not address reinstatement provisions, but instead interpret provisions concerning insurance coverage exclusions. *USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499 (7th Cir. 2020) (analyzing "any insured" in an exclusionary provision); *City of Carlsbad v. Ins. Co. of State of Pa.*, 102 Cal. Rptr. 3d 535 (2009) (analyzing "any insured" in an exclusionary provision); *Allstate Ins. v. Freeman*, 443 N.W.2d 734 (Mich. 1989) (analyzing "an insured" in an exclusionary provision in a

homeowner's insurance policy). Lincoln has not explained why provisions that limit coverage for specific acts carry persuasive weight in interpreting reinstatement provisions, which serve the opposite purpose of reviving coverage as a whole.[5] The Court is not convinced these cases are relevant here.

Other dictionary definitions support Plaintiffs' interpretation of "any." *See, e.g.*, *Webster's Third New International Dictionary of the English Language Unabridged* 97 (1993) (defining "any" as "1: . . . one or some indiscriminately"); *Shorter Oxford English Dictionary* 95 (6th ed. 2007) (defining "any" for singular use as "a, some, no matter which, or what" and for plural use as "some, no matter which, of what kind, or how many"). These definitions suggest the ordinary meaning of "any living insured" is that either of the Harrises can provide proof of insurability for reinstatement.

Moreover, a "Change of Face Amount" provision in the Policy demonstrates that Lincoln knew how to draft a proof requirement applying to both Plaintiffs. (Policy at 9.) This provision allows the Plaintiffs to increase the face amount of their insurance upon submission of an application. (*Id.*) As part of the application, "[Lincoln] will require due proof that *the insureds* are still insurable." (*Id.* (emphasis added).) The use of the definite article and the plural form of 'insured' starkly contrasts with the broader "any living

---

[5] The Court also notes that exclusionary provisions are construed narrowly, with the burden placed on the insurer to prove that the policy exclusion applies and with any ambiguity resolved in the insured's favor. *Thommes*, 622 N.W.2d at 158 (citing *State Farm Ins. Cos. v. Seefeld*, 481 N.W.2d 62, 64 (Minn. 1992) and *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn. 1986)). Thus, any use the Court might make of cases interpreting exclusionary provisions would likely not support Lincoln's position.

insured" in the reinstatement provision. Therefore, the "Change of Face Amount" provision further confirms that "any living insured" allows "one or some [insured] indiscriminately" to provide proof of insurability for reinstatement. *Webster's Third Dictionary* at 97.

By analogy, Lincoln contends that the "Suicide" provision in the Policy, which addresses what happens if "either insured" dies by suicide, shows that if "the parties ha[d] intended to include evidence of insurability from *either* insured, they could have[.]" (Policy at 15; Def.'s Supp. at 11.) The Court disagrees. Given the "Change of Face Amount" provision, the use of "either insured" in the "Suicide" provision could present an argument that the Policy is ambiguous. But even if the Policy were construed as ambiguous, for the sake of argument, the Court notes that such ambiguity would be construed against Lincoln. *Travelers Indem. Co.*, 718 N.W.2d at 894.

Considering the ordinary meaning of "any" and its use in the context of the Policy, the Court finds that "any living insured" in the second reinstatement condition allows either John or Jenifer Harris to submit proof of insurability for reinstatement. Because Lincoln did not evaluate Ms. Harris's insurability, Lincoln has not proved that it complied with the Policy as a matter of law. Accordingly, the Court denies summary judgment to Lincoln on Plaintiffs' breach of contract claims relating to reinstatement of the Policy.

## IV.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Doc. No. 32] is **GRANTED** as to Plaintiffs' unjust enrichment claim.

2. Defendant's Motion for Summary Judgment is **DENIED** as to all remaining claims.

3. The Court grants Lincoln's request to evaluate Ms. Harris's insurability. The parties must immediately meet and confer to determine a schedule for the production and evaluation of Ms. Harris's medical evidence. Any dispute regarding this process should be directed to Magistrate Judge Leung.

4. The parties shall provide the Court with an update within 30 days of this Order. Included in the update should be each party's position as to whether this matter should be tried to a jury or the bench.


**IT IS SO ORDERED**.


Dated: October 25, 2022                          s/Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge